**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
**SABRINA LEVY, JOSEPH BAILEY, BONNIE**
**PHILLIPS, VALERIE MACHEMER, JOHN**
**KUPER, and CHARLES ROSSI, individually and on**
**behalf of all others similarly situated,**

             **Plaintiffs,**

    - against -


**VERIZON INFORMATION SERVICES INC., a**
**Division of Verizon Communications Inc.,**
**VERIZON DIRECTORIES, CORP., VERIZON**
**ACCOUNTING AND INFORMATION SERVICES,**
**INC., and VERIZON NEW YORK DIRECTORY**
**SALES COMPANY,**

             **Defendants.**
-------------------------------------------------------------------x
**JOSEPH PASQUALI, EVE WEGENER, EDWARD**
**SMITH and KIM COSSART, on behalf of themselves**
**and all other similarly situated and as class**
**representatives,**

             **Plaintiffs,**

    - against -


**VERIZON INFORMATION SERVICES, INC.,**
**VERIZON DIRECTORIES, CORP., VERIZON**
**ACCOUNTING AND INFORMATION SERVICES,**
**INC., and VERIZON NEW YORK DIRECTORY**
**SALES COMPANY,**

             **Defendants.**
-------------------------------------------------------------------x

**OPINION AND ORDER**

**06 CV 1583 (NG) (SMG)**


**06 CV 5056 (NG) (SMG)**

**GERSHON, United States District Judge:**

     Plaintiffs Sabrina Levy, Joseph Bailey, Bonnie Phillips, Valerie Machemer, John Kuper,

Charles Rossi, Joseph Pasquali, Eve Wegener, Edward Smith, and Kim Cossart (collectively, "the

Named Plaintiffs") bring this consolidated class action against defendants Verizon Information Services, Inc., Verizon Directories, Corp., Verizon Accounting and Information Services, Inc., and Verizon New York Directory Sales Company (collectively, "Verizon" or "the Company") for (1) unlawful wage deductions under state law and (2) failure to make required overtime payments under federal and state law. Verizon now seeks dismissal of plaintiffs' unlawful wage deduction claims. For the reasons set forth below, Verizon's motion is granted.

## FACTS

The following facts are either alleged in the complaint or, as described below, properly viewed as incorporated into the complaint.

**The Parties**

Defendant Verizon Information Services, Inc. publishes, among other things, Yellow Page print directories, and it controls the internet search portal SuperPages.com. At all relevant times, Verizon employed the Named Plaintiffs and the alleged class members. As Verizon sales representatives, plaintiffs sell advertising in the Yellow Pages and on SuperPages.com.[1] Some of the plaintiffs are Telephone Sales Representatives ("TSRs"), who work inside Verizon's offices and contact subscribers and potential customers by telephone. Others are Premise Sales Representatives ("PSRs"), who travel outside Verizon's offices to customer locations to make sales in person. The Named Plaintiffs work out of Verizon's offices in Albany, New York; Buffalo, New York; Somerset, New Jersey; and Bethlehem, Pennsylvania.

According to the First Amended/Consolidated Class Action Complaint (the "complaint"),

---

[1] While some plaintiffs remain in Verizon's employ, others, after working during the relevant time period, have since left the company. Although the facts presented here are phrased only in the present tense, they refer to both current and former Verizon employees.

plaintiffs work under written compensation plans, described in more detail below, which provide a modest base wage and commissions (or "incentive compensation"), which Verizon projected would roughly equal but could far exceed the base wage. These incentive wages, which are based on an individual's personal success and productivity in selling Yellow Pages or other Verizon advertising, comprise a substantial and integral component of the overall compensation of plaintiffs.

Plaintiffs are all represented by the Communication Workers of America, AFL-CIO ("CWA" or the "Union"). Since early 2002, Verizon has recognized the CWA as the sole and exclusive bargaining agent of the Company's sales representatives in its Northeast and Middle Atlantic Regions. Accordingly, the CWA represents plaintiffs for the purpose of collective bargaining with respect to rates of pay, wages, hours, and other conditions of employment. Verizon's sales workforce in New York and the Mid-Atlantic region through Virginia (the "Region") is organized into separate bargaining units, each unit representing a different geographic area in which the Company has offices. Verizon therefore operates under separate collective bargaining agreements (collectively, "CBAs") that it has entered into with the CWA in the Region. The effective date of each CBA is February 9, 2003.[2] The CBAs that cover the plaintiffs are identical in all material respects.

**Article 9 of the CBAs and the Related Compensation Plans**

Article 9 of each CBA includes a provision that governs the plaintiffs' sales compensation. Specifically, Article 9 references Verizon's Modified Sales Compensation Plan (the "MSCP") as

---

[2] The New Jersey and Pennsylvania CBAs have been in effect from February 9, 2003, through the present. The New York CBAs, however, expired in October 2005, which triggered a state-wide labor union strike that lasted until February 5, 2006, when renegotiated New York CBAs became effective.

follows:

> VIS's Modified Sales Compensation Plan (MSCP), which includes Base Pay Ranges, will apply to sales representatives in each job title. The MSCP will be implemented in conjunction with VIS sales policies as adjusted periodically. Base pay administration will be in accordance with the Company's Merit Pay Plan.

2003 CBA, Art. 9, § 9.1.

The MSCP in effect at the time this lawsuit was filed is commonly referred to as the Encompass Incentive Compensation Plan (the "Encompass Plan"), which went into effect in July 2003. The Encompass Plan superseded the prior incentive compensation plan, which is commonly referred to as the SalesPay Plan.[3] As summarized below, the Plans set forth the conditions under which incentive compensation is earned and paid. For example, the Encompass Plan defines when incentive compensation is earned and distinguishes earned incentive compensation from incentive compensation advances:

> Advances versus Earned Incentive Compensation: Incentive compensation is not "earned" until the sale is Final, and a sale is not deemed Final for incentive compensation purposes unless and until the customer advertising is accepted and published in accordance with the terms and conditions of the customer's contract with [the Company]. Thus, for example, when customer advertising is cancelled and removed from publishing and billing, no incentive compensation is earned. Nevertheless, [the Company] will advance to Plan Participants incentive compensation based upon preliminary sales results. All incentive compensation that is advanced is subject to true-up and true-down and reconciliation with earned incentive compensation (once sales become final) and thus, incentive compensation that is advanced and that is greater than what the Plan Participant actually earned will be recovered by [the Company] from the Plan Participant (either from future incentive compensation or otherwise).

Encompass Plan, Policies and Procedures, § C.7.

The Encompass Plan also sets forth how sales incentive compensation is calculated and how

---

[3] The Encompass Plan and the SalesPay Plan are collectively referred to as the "Plans."

the Company can make adjustments to incentive compensation advances based on post-sale activity:

>Incentive Advance Payment and Recovery: [The Company] calculates sales incentive compensation advances based on a typical customer commitment of twelve (12) months for each contract of sale made by the customer through a [Company] sales representative. Therefore, sales incentive rates are based on twelve-month value. Sales incentive compensation advances are subject to adjustments based on post sale order adjustment activity.

Encompass Plan, Policies and Procedures, § C.8.

The Encompass Plan also addresses how incentive compensation overpayments are to be treated:

>Overpayment: In the event that an overpayment occurs, the amount owed the Company will be deducted from future sales incentive compensation payouts before the Company pays any further sales incentive compensation payouts. If necessary, this procedure will continue through the Plan year. At Plan year-end, if an overpayment situation occurs or still remains, the debt will continue to be retired by deducting from future sales incentive compensation payouts. If the debt is not retired by the end of the following Plan year, then the employee must retire the debt within thirty (30) calender days of notification by Sales Management.

Encompass Plan, Policies and Procedures, § C.16.

Finally, the Encompass Plan sets forth the factors to be considered in the quota/objective setting process:

>Quotas and Targets: VIS Sales Management has the sole discretion to assign Quotas/Objectives as it deems fit. Factors to be considered in the quota/objective setting process may include, but are not limited to, the following:

>- Introduction of new products and services
>- Business potential in each account/territory
>- Local and national economic trends
>- Current Business Plan, including competitive analysis
>- Account Plan
>- Impact of planned sales promotion(s) and advertising
>- Historical data
>- Unplanned sales opportunities
>- Participant eligibility dates
>- Reassignment of revenue

5

VIS reserves the right, in its sole discretion, to make changes (up or down) to individual quotas/targets due to changes in competition or any other factor(s) it deems appropriate.

Encompass Plan, Policies and Procedures, § C.3.

The SalesPay Plan likewise set forth how and when incentive compensation was earned and the conditions under which it was paid. The SalesPay Plan provided that Verizon had the right to "recover[] for amounts paid as incentives which are not earned in accordance with the Terms and Conditions contained in the [Plan]." SalesPay Plan, Statement of Acceptance, § X. In addition, the SalesPay Plan set forth the factors to be considered in the quota/objective setting process:

Quotas and Targets: VIS Sales Management will assign Quotas/Objectives. Factors to be considered in the quota/objective setting process may include, but are not limited to, the following:

- Introduction of new products and services
- Business potential in each account/territory
- Local and national economic trends
- Current Business Plan, including competitive analysis
- Account Plan
- Impact of planned sales promotion(s) and advertising
- Historical data
- Unplanned sales opportunities
- Participant eligibility dates

VIS reserves the right to make changes (up or down) to individual targets due to changes in competition or other factors at the sole discretion of sales management.

SalesPay Plan, Provisions, § V.C.3.

As mentioned above, the MSCP is referenced by Article 9 of the CBAs. Article 9 also has additional provisions that govern sales compensation. For example, Article 9 provides that Verizon has the right to determine the objectives applicable to each sales representative under the MSCP. In addition, Article 9 affords the Company the right to make changes to the MSCP after notice to

and bargaining with the CWA. The CBA specifies how disagreements over unilateral changes to the MSCP are to be handled and the appropriate remedies with respect to such changes. Article 9 also defines some of the terms used in the MSCP and sales policies.

The CBA also contains a broad arbitration provision that provides:

> In the event a grievance involving the interpretation or application of any of the provisions of this Agreement is not satisfactorily resolved following the grievance procedure, the Union must request that the matter proceed to arbitration within thirty (30) calender days following the company's final written reply. . . . The decision of the arbitrator shall be final and binding upon both parties, and shall not be subject to other legal challenge.

2003 CBA, Art. 17, §§ 17.1, 17.2.

**Plaintiffs' Claims**

Plaintiffs challenge Verizon's "unilateral establishment and implementation of sales compensation plans and related sales policies which made reductions from wages allegedly in violation of state law." Pls.' Mem. at 2. Specifically, plaintiffs allege that, under the Plans, sales representatives' wages were unlawfully reduced when certain existing customer accounts could not be renewed. These alleged deductions were purportedly made irrespective of whether the sales representative had control over the facts giving rise to the non-renewal and regardless of the profits Verizon may have made from the customer account. In addition, plaintiffs allege that Verizon made unlawful "chargebacks" when it recouped incentive compensation overpayments that it had advanced. Plaintiffs contend that these "chargebacks" were made to offset adjustments, cancellations and credits given to customers. "Chargebacks" were also allegedly issued by Verizon to plaintiffs when Verizon customers failed to pay for prior advertising in the Yellow Pages. According to the complaint, these policies were deceptive because Verizon did not adequately disclose them to plaintiffs either at the time of hire or, if later, upon the adoption of either the

SalesPay Plan or the Encompass Plan.

Plaintiffs allege that Verizon's policy of making these adjustments, deductions and/or "chargebacks" under the Plans violated New York, New Jersey and Pennsylvania statutes that limit an employer's right to make deductions from an employee's earned wages. Specifically, plaintiffs allege that Verizon failed to pay the New York Named Plaintiffs and the New York Wage Deduction Class members wages that they earned in violation of Article 6 of the New York Labor Law ("NYLL"), §§ 190 *et seq.*, and has made unlawful deductions from their wages without their consent in violation of NYLL § 193. Plaintiffs further allege that Verizon has failed to pay the New Jersey Named Plaintiff and the New Jersey Wage Deduction Class members the full amount of wages due and payable to them in violation of the New Jersey Wage Payment Law ("NJWPL"), N.J.S.A. §§ 34:11-2 *et seq.*, has failed to pay them the wages fairly and reasonably commensurate with the value of their services in violation of N.J.S.A. §§ 34:11-56a *et seq.*, and has wrongfully withheld and diverted a portion of their wages in violation of N.J.S.A. §§ 34:11-4.4(b)(1-11). Lastly, the plaintiffs allege that Verizon has failed to pay the Pennsylvania Named Plaintiff and the Pennsylvania Wage Deduction Class members earned wages due and payable to them, thereby violating Chapter 8 of the Pennsylvania Wage Payment and Collection Law ("PWPCL"), 43 P.S. §§ 260.1 *et seq.*,[4] and has made unauthorized deductions from their wages, which were not provided for by law or authorized by the regulations of the Pennsylvania Department of Labor and Industry.

---

[4] The complaint mistakenly states that the Pennsylvania plaintiffs bring their claims pursuant to 43 P.S. §§ 260.11 (a repealed section of the PWPCL), *et seq. See* Compl. ¶ 178. The court assumes that plaintiffs intended to cite to 43 P.S. §§ 260.1 *et seq.*, as they rely, in their papers, on §§ 260.2a and 260.3. *See* Pls.' Mem. at 25, n.11.

**Defendants' Claim of Preemption**

Verizon asserts that plaintiffs' state law claims are preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and therefore should be dismissed. In short, Verizon contends that, in order to adjudicate the state claims, the court would have to interpret the CBAs. For example, Verizon argues, the court would have to consider whether the deductions are permitted under the CBAs and would therefore need to interpret the CBAs and Encompass Plan which the CBAs incorporate. For this reason, Verizon contends that the state law claims are fully preempted by § 301 and that, under § 301, the claims are unexhausted and must be dismissed.

## DISCUSSION

### I.      Standard of Review

On a motion to dismiss, the allegations in the complaint are accepted as true. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). The court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955, 1964 (2007) (internal quotation marks, citations, and alterations omitted). Indeed, a plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." *Id*. at 1974. This "plausibility standard" is a flexible one, "oblig[ing] a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, --- F.3d ----, 2007 WL

1717803, at *11 (2d Cir. June 14, 2007).

In deciding the motion, the court may consider documents that are referenced in the complaint, documents that plaintiffs relied on in bringing suit (that are either in the plaintiffs' possession or were known to plaintiffs at the time they brought suit), or matters of which judicial notice may be taken. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see also Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (holding that "[w]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint, the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated"). Plaintiffs' careful avoidance of referencing documents that are integral to the complaint does not deprive the court of its power to review them on a motion to dismiss. *See Yak v. Bank Brussels Lambert*, 252 F.3d 127, 131 (2d Cir. 2001).

In moving to dismiss, Verizon calls upon documents neither attached to nor directly referenced by the complaint. Specifically, Verizon proffers copies of the applicable CBAs in force between the parties during the relevant time period. In addition, Verizon submits to the court, and relies upon, the Encompass Plan, which is referenced by the CBAs, and the SalesPay Plan, which, along with the Encompass Plan, is mentioned in the complaint. Plaintiffs argue that the court must exclude the CBAs and Plans from its consideration because they were not attached, relied on, quoted, or incorporated by reference by the complaint.[5] I disagree.

---

[5] Plaintiffs also argue that "the court may not consider the CBAs" because Verizon, in its opening papers, had "not produced the CBAs – only certain hand-picked portions." Pls.' Mem. at 6. While it is true that Verizon did not attach to its papers the full text of the CBAs, it did excerpt the relevant portions of the agreements. Plaintiffs have not supplied any additional portions of any of the CBAs nor have they suggested that any omitted portions are in fact relevant to the inquiry at hand.

Plaintiffs expressly rely on the incentive compensation Plans in the complaint. Indeed, plaintiffs repeatedly assert that Verizon, at least in part by using the Plans at issue in this case, imposed unlawful adjustments and deductions from plaintiffs' earned wages without their consent. *See, e.g.,* Compl. ¶ 95 ("Verizon calculated the commission/incentive wage . . . pursuant to . . . the SalesPay Plan [and] Encompass"); ¶ 108 ("Verizon . . . had a 'chargeback' policy [detailed in both Plans] and practice that resulted in a deduction from wages paid to the employee—'or chargeback'—to offset adjustments, cancellations and credits"); ¶ 111 ("[u]nder Encompass, when a sales employee was unable to contact an account [Verizon] assigned to him or her at the time of renewal, Verizon would charge back the sales employee on the monthly revenue of the account"). Because plaintiffs reference and rely upon the Plans in the complaint, review of them on this motion is proper.

Review of the CBAs is also proper, despite plaintiffs' careful avoidance of mentioning them in the complaint. In fact, plaintiffs do reference the CBAs, albeit indirectly, by relying on the Encompass Plan, which was incorporated into the CBAs by reference. The plain language of Article 9 of the CBAs expressly states that the "Modified Sales Compensation Plan . . . *will apply* to sales representatives in each job title." CBAs, Art. 9, § 9.1 (emphasis added). This language is sufficient to incorporate the Modified Sales Compensation Plan, later named the Encompass Plan, into the CBAs. *See, e.g., Ins. Co. of North America v. S/S CTE Rocio*, No. 91-2820, 1992 WL 200874, at *4 n.8 (S.D.N.Y. June 17, 1992) (finding certain provisions of law incorporated by reference into a bill of lading where the bill of lading stated that the provisions "will apply before loading and after unloading while the goods are in the custody of the company"). *Cf. Lamb v. Emhart Corp.*, 47 F.3d 551, 554 (2d Cir. 1995) (finding stock option plans incorporated by reference into a termination

agreement where agreement stated that stock options "will be determined in accordance with the terms of the respective stock option plans under which the options were granted").[6]  Indeed, Article 9 demonstrates that Verizon had a contractual obligation under the CBAs to follow the Encompass Plan.[7]  Because plaintiffs rely upon the Encompass Plan in the complaint, which in turn references the CBAs, review of the CBAs is appropriate.[8]

---

[6]  Plaintiffs argue that, although Article 9 "refers" to a compensation plan, this does not constitute "incorporation by reference."  Specifically, plaintiffs argue that "[t]here is nothing in Section 9.1, or anywhere else in the CBAs, reflecting an intention to treat the Encompass plan . . . as if [it] were contained in, or part and parcel of, the CBAs." Pls.' Mem. at 14.  Relying on a definition found in Black's Law Dictionary, plaintiffs argue that, in order to be incorporated by reference into a CBA, the terms of a document must be specifically declared "incorporated by reference" in the CBA, or specifically attached to it as an exhibit.  *Id.*  This formalistic argument lacks merit.  Indeed, "[i]t is not necessary, in order to incorporate by reference the terms of another document, that such purpose be stated in *haec verba* or that any particular language be used. . . .  [I]t is settled doctrine that a reference in a contract to another writing, sufficiently described, incorporates that writing." *Lowry & Co. v. S. S. Le Moyne D'Iberville*, 253 F.Supp. 396, 398 (S.D.N.Y. 1966).  Such is the case here, as Article 9 makes clear that Verizon was contractually required by the CBAs to apply the Encompass Plan to plaintiffs.  Plaintiffs also argue that the CBAs could not have incorporated the Encompass Plan because the Encompass Plan went into effect six months after the union ratified the CBAs.  This argument is of no moment, as parties to an agreement can incorporate by reference documents that are not yet in existence. *Lamb*, 47 F.3d at 558 (2d Cir. 1995).  In sum, I find that the language employed in Article 9 sufficiently incorporates by reference the Encompass Plan.

[7]  Although the CBAs went into effect in February 2003, the Encompass Plan did not take effect until July of that year, when it superceded the SalesPay Plan.  Therefore, Verizon was not bound by the Encompass Plan until July 2003.

[8]  Verizon alternatively asks that, "[i]n the event that the court decides that it is not appropriate to address Defendant's motion as a motion to dismiss, . . . the Court convert the motion to one for summary judgment." Defs.' Mem. at 12, n.8.  Conversion is unnecessary.  As explained in the text, the court can properly consider the CBAs and Plans on Verizon's motion to dismiss.  Verizon is correct, however, that, upon such a conversion, this matter would be ripe for summary judgment:  there are no disputed facts concerning the authenticity of the CBAs and the Plans, or plaintiffs' union membership.  In other words, there are pure issues of law before the court (*e.g.*, whether, considering plaintiffs' union membership and the terms of the CBAs and Plans by which plaintiffs were bound, their claims are preempted by federal law).  Indeed, despite plaintiffs' insistence that they would need additional discovery to litigate a summary judgment motion, *see* Pls.' Mem. at 27., when pressed at oral argument, plaintiffs were unable to

## II.	§ 301 Preemption

Section 301 of the LMRA provides that:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). The Supreme Court has interpreted § "301 as a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985). Thus, when a state claim alleges a violation of a labor contract, the Supreme Court has held that such claim is preempted by § 301 and must instead be resolved by reference to federal law. *Id*. at 210. Further, and more pertinent to this case, the Supreme Court has extended the preemptive effect of § 301 beyond suits alleging contract violations:

> [Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.

*Id*. at 211. Indeed, § 301's sweeping force extends so far as to preempt claims alleging state statutory violations if, in adjudicating those claims, the court would have to rely on federal law. *See Vera v. Saks & Company*, 335 F.3d 109 (2d Cir. 2003). "[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers*, 471 U.S. at 220 (internal citation omitted).

---

articulate any factual disputes which would prevent adjudication of the legal issues present at this juncture. *See* Oral Argument Tr. 33-35, May 30, 2007.

However, not every suit concerning employment or tangentially involving a CBA is preempted by § 301. *Id*. at 211. For example, if a state prescribes rules or establishes rights and obligations that are independent of a labor contract, actions to enforce such independent rules or rights would not be preempted by § 301, unless they require substantial interpretation of the CBA. *Id*. at 212. Nor would a state claim be preempted if its application required mere referral to the CBA for "information such as rate of pay and other economic benefits that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413 n.12 (1988).

With these principles in mind, a court must engage in a two-part analysis in order to determine whether a state law claim is preempted by § 301. First, a court must analyze the "legal character" of the claim and whether it is truly independent of rights under the collective bargaining agreement. *Livadas v. Bradshaw*, 512 U.S. 107, 123-24 (1994); *Foy v. Pratt Whitney Group*, 127 F.3d 229, 234 (2d Cir. 1997). The starting point in making such a determination is consideration of the elements of plaintiffs' stated claims. *Salamea v. Macy's East, Inc.*, 426 F.Supp.2d 149, 154 (S.D.N.Y. 2006). If the right exists solely as a result of the CBA, and not by virtue of state law, then the claim is preempted, and the analysis ends there.

Second, even if the right exists independently of the CBA, the court must still consider whether it is nevertheless "'substantially dependent on analysis of a collective-bargaining agreement.'" *Burnside v. Kiewit Pacific Corp*., --- F.3d ----, 2007 WL 1760747, at *5 (9th Cir. 2007) (quoting *Caterpillar*, 482 U.S. 386, 394 (1987)); *see also Allis-Chalmers*, 471 U.S. at 213 (explaining that when "state . . . law purports to define the meaning of the contract relationship, that law is preempted"). If such dependence exists, the claim is preempted by § 301; if not, the claim

14

can proceed under state law. *Burnside*, 2007 WL 1760747, at *5. In making this determination, courts must consider whether the claim can be resolved by "look[ing] to" versus interpreting the CBA. *See Livadas*, 512 U.S. at 125. "If the latter, the claim is preempted; if the former, it is not." *Burnside*, 2007 WL 1760747, at *5.

Plaintiffs assert unlawful wage deduction claims against Verizon under New York, New Jersey, and Pennsylvania law. *See* NYLL § 193; N.J.S.A. §§ 34:11-4.4(b)(1-11); 43 P.S. §§ 260.1 *et seq*. All three states prohibit employers from making deductions from employees' earned pay unless required or permitted by law.[9] To establish an unlawful wage claim under any of these state laws, plaintiffs would be required to show that Verizon deducted monies from their earned wages and that such deductions are not permissible under the respective state statute. *See, e.g., Matter of*

---

[9] For example, § 193 of the NYLL provides, in pertinent part, that:

1. No employer shall make any deduction from the wages of an employee, except deductions which:

a. are made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency; or
b. are expressly authorized in writing by the employee and are for the benefit of the employee; provided that such authorization is kept on file on the employer's premises. Such authorized deductions shall be limited to payments for insurance premiums, pension or health and welfare benefits, contributions to charitable organizations, payments for United States bonds, payments for dues or assessments to a labor organization, and similar payments for the benefit of the employee.

2. No employer shall make any charge against wages, or require an employee to make any payment by separate transaction unless such charge or payment is permitted as a deduction from wages under the provisions of subdivision one of this section.

NYLL § 193 (McKinney 2007). The New Jersey and Pennsylvania unlawful wage deduction statutes employ similar language.

*Hudacs v. Frito-Lay, Inc.*, 90 N.Y.2d 342, 346-47 (1997) (regarding New York law). Plaintiffs'

claims, therefore, derive from rights conferred as a matter of state law, not from the CBAs. Because

these state law claims exist independently of the CBAs at issue, they are not, under the first prong

of the court's §301 analysis, subject to preemption.

Plaintiffs' claims are, however, preempted by § 301 because they "substantially depend[ ]

on" an interpretation of the terms of the CBAs. *See Caterpillar*, 482 U.S. at 394. Indeed, the

Second Circuit's decision in *Vera v. Saks & Company*, 335 F.3d 109 (2d Cir. 2003), compels such

a result. In *Vera*, the Court of Appeals specifically found plaintiff's NYLL § 193 claim to be

preempted by § 301. In that case, the plaintiff, a shoe salesman, alleged that his employer's practice

of charging back unidentified returns against his commissions, as required by the CBA, violated §

193. In an attempt to avoid preemption, the plaintiff argued that § 193 creates state rights that are

independent of the CBA and that he could establish his employer's liability under § 193 without any

analysis of the CBA's terms. To support his argument, plaintiff recited "the common law default

rule that commissions are earned at the time of sale, apparently reasoning that under state law,

because commissioned salespeople earn commissions at the time of the sale, any action taken after

the time of the sale that reduces one's commission is a deduction from wages within the meaning

of section 193." *Id.* at 115. Although plaintiff acknowledged that parties may contract to alter this

default rule, the court noted, "he contends that there is no need to interpret the CBA to see if Saks

and the union here agreed to alter the rule because the CBA is silent on this issue." *Id.* After

considering plaintiff's argument, the court found that the case required interpretation of the CBA:

"For example, we must interpret the CBA to determine whether it embodies an agreement between

the parties to alter the common law rule regarding when commissions are earned." *Id.* Accordingly,

the court determined that the claim was preempted by § 301.

As in *Vera*, the resolution of plaintiffs' state law claims requires substantial interpretation of the CBAs. Plaintiffs offer a variety of claims in support of their allegation that Verizon's deductions were unlawful. As an initial matter, in assessing those claims, the court would have to ascertain whether the deductions were permitted under the CBAs; such a determination would plainly require the court's interpretation of the CBAs. More importantly, the court would have to analyze the CBA language to decide whether incentive compensation was actually *earned* before deciding if wages were subsequently deducted in violation of state law. For example, to assess the merits of plaintiffs' claim that "Verizon . . . had a 'chargeback' policy and practice that resulted in a deduction from wages paid to the employee – or 'chargeback' – to offset adjustments, cancellations, and credits Verizon had provided to a customer," (Compl. ¶ 108), the court would necessarily have to analyze § C.7 of the Encompass Plan that is incorporated in the CBA, which provides that "[i]ncentive compensation is not 'earned' until the sale is Final, and a sale is not deemed Final for incentive compensation purposes unless and until the customer advertising is accepted and published in accordance with the terms and conditions of the customer's contract with VIS." Because plaintiffs' unlawful wage deduction claims "substantially depend[ ] on" interpretation of the CBAs, and the plan they incorporate, federal labor law governs this dispute. *See Caterpillar*, 482 U.S. at 394. Accordingly, the state law claims are preempted.

Applying § 301 of the LMRA, plaintiffs' claims are barred because plaintiffs have failed to exhaust their arbitral remedies under the CBAs. Before bringing an action under § 301, "employee[s] must exhaust grievance procedures provided by the relevant collective bargaining agreement." *Dougherty v. AT & T Co.*, 902 F.2d 201, 203 (2d Cir.1990) (citing *Hines v. Anchor*

*Motor Freight, Inc.*, 424 U.S. 554, 563 (1976). Here, exhaustion requires filing a grievance under the CBAs' grievance procedure. It is undisputed that Article 16.1 of the CBAs defines a grievance broadly to include, *inter alia*, "a complaint that an employee or group of employees in the bargaining unit has been unfairly treated." Once a grievance has been fully processed, the Union, and only the Union, can decide to take a dispute "involving the interpretation or application of any of the provisions of [the] Agreement" to arbitration under Article 17. 2003 CBA, Art. 17, §17.1. It is further undisputed that none of the plaintiffs has ever filed a grievance concerning the matters encompassed in the complaint, and the Union has never sought arbitration with respect to these claims. This is fatal to any attempt by plaintiffs to now assert their claims under § 301 for breach of the CBAs.

The above finding of preemption fully disposes of all wage deduction claims asserted under New Jersey law. In light of their employment dates and the applicable statute of limitation, the New Jersey plaintiffs do not seek relief for the period prior to July 2003 (the effective date of the Encompass Plan, as incorporated by the CBAs, and, accordingly, the date on which plaintiffs' state law claims became dependent on federal labor law). *See* Comp. ¶ 61. This leaves only New York and Pennsylvania law claims.

With regard to the New York law claims, two distinct categories require separate analysis. First, plaintiffs argue that there can be no preemption of New York claims arising between October 2005 and February 5, 2006, because there were no New York CBAs in effect during that time.[10]

_____

[10] As indicated above, the New York CBAs expired in October 2005, a labor strike ensued, and the renegotiated New York CBAs took effect on February 5, 2006. All New York claims arising during this period will hereinafter be referred to as the "New York interim claims."

Second, plaintiffs press the pre-July 2003 claims of the New York plaintiffs. These claims are not preempted, as they arose before the Encompass Plan came into effect.[11] Verizon, however, moves for their dismissal on the ground that they fail as a matter of New York state law.

With regard to the Pennsylvania law claims, plaintiffs' pre-July 2003 claims are similarly not preempted and therefore require further analysis.[12] Verizon moves for their dismissal as well, arguing that, like the New York claims, they fail as a matter of state law. I will address each of the aforementioned categories in turn.

## III. New York Interim Claims

Verizon recognizes that § 301 of the LMRA has no application in the absence of a currently effective CBA. *See Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 25 (2d Cir. 1988). Indeed, § 301's sweeping preemptive force applies "only where state law claims coincide with *current* collective bargaining agreements." *Id.* Accordingly, plaintiffs' New York interim claims are not subject to § 301 preemption. Verizon, however, argues that these claims are preempted under the *Machinists* doctrine. I agree.

States are not free to regulate in areas Congress intended to be left to "the free play of economic forces." *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 140 (1976) (citation omitted). The Supreme Court

---

[11] Named New York plaintiffs Levy, Phillips, Machemer, Wegener, and Cossart began work at Verizon before July 2003. The pre-July 2003 portions of their claims are thus not subject to preemption. New York plaintiffs Bailey, Pasquali, and Smith, however, all began work at Verizon after July 2003. *See* Comp. ¶¶ 18, 23, 27. Their wage deduction claims are therefore barred as preempted.

[12] Named Pennsylvania plaintiff Rossi began work at Verizon before July 2003. The pre-July 2003 portion of his claim is therefore not subject to preemption.

has broadly construed this "*Machinists* preemption" doctrine to bar "state interference with policies implicated by the structure of the [NLRA] itself." *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 749 (1985). Thus, courts must look to that structure "to determine whether certain conduct [is] meant to be unregulated." *Id*. at 749 n.27.

Where a CBA expires, "the parties must maintain the status quo until they have negotiated to impasse, and an employer's unilateral change of terms and conditions of employment during this process constitutes a failure to bargain in good faith under NLRA section 8(a)(5)." *Derrico*, 844 F.2d at 26 (citing *NLRB v. Katz*, 369 U.S. 736, 743 (1962)). "A corollary to this principle is that after expiration of a CBA and before impasse in bargaining, it is an unfair labor practice for an employer unilaterally to alter the status quo defined by the expired contract." *Id*. *See also U.A. 198 Health & Welfare, Education & Pension Funds v. Rester Refrigeration Service, Inc.*, 790 F.2d 423, 425 (5th Cir. 1986) (employer "must honor" terms of expired CBA); *NLRB v. Sherwin-Williams Co.*, 714 F.2d 1095, 1102 (11th Cir. 1983) (unfair labor practice "to withhold, discontinue, or cancel" benefit under expired contract before impasse); *Carpenter Sprinkler Corp. v. NLRB*, 605 F.2d 60, 64-65 (2d Cir. 1979) (affirming NLRB's finding of § 8(a)(5) violation because bargaining had not reached impasse at time employer announced intent to replace terms of expired contract with "new schedule" of wages and benefits). State regulation that interferes with this federally required maintenance of post-expiration status quo creates "substantial potential for friction" with the "delicate machinery of the NLRA." *Derrico*, 844 F.2d at 28. Accordingly, a state law breach of contract claim that is premised on a party's maintenance of the status quo, following the expiration of a CBA, must be considered preempted under the *Machinists* doctrine. *Id*. at 29.

Here, the CBAs expired in October 2005. Under them, Verizon had been required to

compensate the sales representatives under the terms of the applicable incentive compensation plan, the Encompass Plan. Thus, upon expiration of the CBAs in October 2005, pending impasse or new CBAs, federal law prohibited Verizon from departing from the terms contained in the CBAs. *Id.* at 26.

In the complaint, plaintiffs allege that Verizon's incentive compensation Plans violated state law (*i.e.*, that Verizon's practice of recovering incentive compensation "advances" constituted unlawful wage deductions). The majority of these claims, which arose during the pendency of the CBAs at issue, are preempted by § 301 for the reasons indicated above. However, by pressing the New York interim claims, plaintiffs in effect argue that, once the CBAs had expired, Verizon should have complied with state law by changing the sales representatives' incentive compensation structure (that was called for by the expired CBAs), thereby altering the status quo. Doing so during the CBAs' post-expiration period would plainly have been an unfair labor practice under federal law. *Derrico*, 844 F.2d at 26. Holding Verizon liable under New York law for maintaining its incentive compensation plan during the post-expiration period, when it was federally mandated to do so, would create "friction" with federal law. Indeed, finding liability would upset the purpose of the post-expiration status quo: to accomplish "industrial peace by fostering a non-coercive atmosphere that is conducive to serious negotiations on a new contract." *Katz*, 369 U.S. at 736. Accordingly, plaintiffs' New York interim claims are preempted under the *Machinists* doctrine.

## IV.    Pre-July 2003 New York Claims

Conceding that plaintiffs' pre-July 2003 New York claims are not preempted, Verizon argues that the claims, as alleged in the complaint, fail as a matter of New York law. By plaintiffs' own description, the complaint challenges "Verizon's establishment and implementation of sales

compensation plans and related sales policies and practices, which made deductions from wages in violation of [New York] state law and had the purpose and effect of transferring the risk of loss from Verizon to the employees." Pls.' Mem. at 20, n.8. Verizon disagrees with plaintiffs' conclusion that "wages" were "deducted," and argues that the actual conduct underlying plaintiffs' allegations – Verizon's "recovery" of "advanced incentive compensation" – does not violate NYLL §§ 190 *et seq*.

Plaintiffs assert claims under § 193 of the NYLL. Section 193 provides that deductions from earned wages are unlawful unless they are (a) required by any law, rule, or regulation issued by a governmental agency, or (b) expressly authorized in writing and are deductions for (i) insurance premiums, (ii) pension, health, or welfare benefits, (iii) charitable contributions, (iv) payments for U.S. bonds, (v) dues payments to a labor organization, or (vi) other "similar payments [that are] for the benefit of the employee." NYLL § 193. On its face, § 193 does not restrict how an employer determines entitlement to commissions or incentive compensation. *Id*. Rather, it simply imposes restrictions on the types of deductions that an employer can make from wages or commissions already earned. *See, e.g., Gennes v. Yellow Book of New York, Inc.*, 3 Misc.3d 519, 521 (Sup. Ct., Nassau Cty. 2004), *aff'd.*, 23 A.D.3d 520 (2d Dep't 2005) ("the purpose of § 193 is to prohibit employers deducting from employees' paychecks any wages *already earned* unless so required by law or for the benefit of the employee") (emphasis added).

Incentive compensation and bonuses constitute "wages" under the NYLL only once they become vested. *Pachter v. Bernard Hodes Group, Inc.,* No. 03-10239, 2005 WL 2063838, at *5 n.8 (S.D.N.Y. Aug. 25, 2005) (citing *Truelove v. Northeast Capital & Advisory Inc.*, 95 N.Y.2d 220, 224-25 (2000)). Because § 193 prohibits only unlawful "wage" deductions, it presents no bar to an employer's recovery of incentive compensation that has yet to vest in its employees. *Dean Witter*

*Reynolds Inc. v. Ross*, 429 N.Y.S.2d 653 (1st Dep't 1980). Where a compensation plan provides that incentive compensation is not earned until the end of a production period – when appropriate adjustments can be made to calculate the "net figure[s]" to which employees are entitled – the incentive compensation does not vest, and thus does not qualify as "wages," until after the amounts due are determined. *Id*. at 381-82. In such a case, advanced, unearned incentive compensation is subject to the employer's recovery. *See id. Cf. Truelove* 95 N.Y.2d at 225 ( rejecting "plaintiff's argument that he had a vested right to bonus payments once defendant declared that a bonus would be paid" and stressing that "an employee's entitlement to a bonus is governed by the terms of the employer's bonus plan").

Here, the Encompass and SalesPay Plan each set forth how and when incentive compensation is earned and the conditions under which it is paid. Under the Encompass Plan, "[i]ncentive compensation is not 'earned' until a sale is Final, and a sale is not deemed Final . . . unless and until the customer advertising is accepted and published in accordance with the terms and conditions of the customer's contract with [the Company]."[13] Encompass Plan, Policies and Procedures, § C.7. Notwithstanding that incentive compensation is not earned until the sale is "Final," Verizon, pursuant to the explicit terms of the Encompass Plan, "advance[s] to [sales representatives] incentive compensation based on the preliminary sales results." *Id*. Advanced compensation is then "subject to true-up and true-down and reconciliation with earned incentive compensation (once sales become final) and thus, incentive compensation that is advanced and that is greater than what the Plan Participant actually earned [is] recovered by VIS from the Plan Participant (either from [the

---

[13] For example, "when customer advertising is cancelled and removed from publishing and billing, no incentive compensation is earned." Encompass Plan, Policies and Procedures, § C.7.

employee's] future incentive compensation or otherwise)." *Id*. Specifically, "in the event that an overpayment occurs, the amount owed the Company [is] deducted from future sales incentive compensation payouts before the Company pays any further sales incentive compensation payouts." Encompass Plan, Policies and Procedures, § C.16.

Likewise, Verizon advanced sales representatives incentive compensation under the SalesPay Plan. *See* SalesPay Plan, Statement of Acceptance, § X (authorizing recovery of "amounts paid as incentives which are not earned in accordance with the Terms and Conditions contained in the [Plan]."). These incentive compensation advances were subject to being "adjusted based on the post sale order adjustments or cancellations." SalesPay Plan, Provisions, § V.D.4. As with the Encompass Plan, the SalesPay Plan provided that, where Verizon advanced more than what the sales representatives actually earned, Verizon was authorized to recoup the overpayment from "future sales incentive payout(s)." *Id*. Incentives paid but not earned were thus treated like indebtedness owed the Company. *See* SalesPay Plan, Provisions, § V.D.14.

As the foregoing illustrates, both the Encompass and SalesPay Plans establish compensation systems whereby sales representatives' incentive compensation is not earned or vested until advanced incentive compensation is "trued up or down" to reflect the closing of customer accounts according to the terms of their contracts. Indeed, under the terms of the Plans, it is only after Verizon reconciles the incentive compensation it has *advanced* to an employee with the incentive compensation that the employee has actually *earned*, that it can determine the "net figure to which [that employee is] entitled." *Dean Witter*, 429 N.Y.S.2d at 658. Because the incentive compensation does not vest before reconciliation, the advanced incentive compensation does not constitute "wages" for purposes of § 193. *See Pachter*, 2005 WL 2063838, at *5 n.8. Accordingly,

24

§ 193 presents no bar to Verizon's recovery of those advances. *See Dean Witter,* 429 N.Y.S.2d at 658. Plaintiffs' claims that Verizon unlawfully deducted wages in violation of § 193, therefore, fail as a matter of law.

## V.     Pre-July 2003 Pennsylvania Claims

Verizon argues that, like the New York claims, plaintiffs' Pennsylvania law claims fail as a matter of law. In short, Verizon asserts that its recovery of advanced incentive compensation does not violate the PWPCL, 43 P.S. §§ 260.1 *et seq*.

Under 43 P.S. § 260.3, *earned* wages must be timely paid with the exception of "deductions provided by the law, or as authorized by regulation of the Department of Labor and Industry for the convenience of the employee." Pursuant to this provision, the Pennsylvania Department of Labor and Industry promulgated regulations setting forth wage deductions that are authorized by law. *See* 34 Pa. Code § 9.1. "The first twelve provisions [of the regulations] delineate such deductions as, for example, contributions to employee welfare and pension plans, payments to credit unions and savings funds, contributions for charitable purposes, deductions for social security and taxes, labor organization dues, and other specified deductions." *Ressler v. Jones Motor Co., Inc.*, 337 Pa. Super. 602, 608 (1985). The final, thirteenth provision permits "other deductions authorized in writing by employees" that the Department, in its discretion, determines to be "proper and in conformity with the intent and purpose of the Wage Payment and Collection Law." 34 Pa. Code § 9.1. Any deduction of *earned* wages not expressly authorized by law or regulation, runs afoul of 43 P.S. § 260.3.

Like the New York statute, 43 P.S. § 260.3 does not, on its face, restrict how an employer determines entitlement to commissions or incentive compensation. Neither does any other section

of the PWPCL.  Also like New York law, although "[t]he [P]WPCL creates a statutory remedy for an employer's breach of its contract duty to pay wages or commissions earned, . . . it is the employment contract which governs whether certain wages or commissions are 'earned.'" *Stebok v. American Gen. Life & Accident Ins. Co.*, 715 F.Supp. 711, 713 (W.D. Pa. 1989), *aff'd*, 888 F.2d 1382 (3d Cir. 1989)).  Indeed, "[s]ince the WPCL does not purport to outline what compensation is due in any particular case, a contractual restriction on when commissions are earned does not frustrate the statute's purpose." *Sendi v. NCR Comten, Inc.*, 619 F.Supp. 1577, 1579 (E.D. Pa.1985), *aff'd*, 800 F.2d 1138 (3d Cir. 1986).  Accordingly, it is necessary to determine whether, under the Plans, plaintiffs earned the commissions they seek to recover.  If not, 43 P.S. § 260.3 is inapplicable.

As indicated above, both the Encompass and SalesPay Plans expressly establish that sales representatives' incentive compensation is not earned until advanced incentive compensation is adjusted to reflect the net figures to which the representatives are entitled.  Because the incentive compensation is not, under the Plans, earned before reconciliation, the PWPCL presents no bar to Verizon's recovery of unearned, advanced incentive compensation.  *See Sendi*, 619 F.Supp. at 1579 (noting that if the plaintiff "*earned* no commissions" under the compensation plans at issue, he could "recover nothing under the WPCL") (emphasis added).  Plaintiffs' claims that Verizon unlawfully deducted wages in violation of 43 P.S. § 260.3, therefore, fail as a matter of law.

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted in its entirety.  Except for the New York interim claims, all of plaintiffs' post-July 2003 unlawful wage deduction claims are preempted by § 301 of the LMRA and are therefore dismissed.  Plaintiffs' New York interim claims are preempted under the *Machinists* doctrine and are similarly dismissed.  Finally,

plaintiffs' pre-July 2003 New York and Pennsylvania claims are dismissed for failure to state a

claim upon which relief can be granted.

**SO ORDERED.**

_____/s/_____
**NINA GERSHON**
**United States District Judge**

Dated: Brooklyn, New York
        July 25, 2007